

**Tagged for Publication**

## ORDERED in the Southern District of Florida on May 24, 2011.

**John K. Olson, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

**In re:**

    Ross F. and Amanda **Charno**,

        Debtors.

_____/

    Donald F. **Walton**,
    *United States Trustee*,

        Plaintiff,

**-v-**

    Ross F. and Amanda **Charno,**

        Defendants.

_____/

Case No. 09-36566-BKC-JKO

Chapter 7

Adversary Proceeding No.

10-03095-JKO

### Findings of Fact and Conclusions of Law

       The United States Trustee filed this action objecting to the Debtors' discharge because he

questions the propriety of their post-petition transfer of a diamond engagement ring to a New York

1

City pawn broker.  The ring was pawned for $10,000.00, which the United States Trustee argues was an improper post-petition transfer made with intent to hinder, delay, or defraud creditors.  The United States Trustee also questions the post-petition transfers of interests in the Debtors' company back and forth between the Joint Debtors.

Count I of the complaint objects to the Debtors' discharge under 11 U.S.C. § 727(a)(2)(B), and Count II objects to discharge under § 727(a)(4)(A).  The Defendants' response and affirmative defenses were filed on July 28, 2010.  Before the trial began on January 28, 2011, the United States Trustee dropped Count II and accordingly only Count I is before me.

### *Background*

Ross and Amanda Charno (the "Debtors") are a married couple who fell on hard times. They were involved with an investment venture that went sour, and the circumstances surrounding the failed venture were tragic.  Mr. Charno's grandfather was the venture's mastermind. Unbeknownst to his family he was suffering from brain cancer, which likely rendered him incompetent to manage the investments as the condition progressed.  The Debtors lost almost $1,000,000.00 while friends of the grandfather, Stanley Spielman and Melvin Gale, also lost a significant amount of money.  Spielman and Gale contended that the Debtors were to blame for their loss and filed a lawsuit against them in the Circuit Court for Palm Beach County.

The Debtors spent about $200,000.00 to defend themselves against the Spielman/Gale lawsuit. They accordingly fell behind on the three mortgages on their home and foreclosure loomed. The Debtors filed a Chapter 7 Voluntary Petition on December 1, 2009.

Initially, the Debtors retained Manny Singh, an able consumer debtor lawyer, to file their bankruptcy petition and paid him $5,000.00 (borrowing $3,500.00 from family members to do so).

2

Mr. Singh's written retention agreement made it clear that he was not a trial attorney and would not defend them in any contested matters or adversary proceedings related to the Spielman/Gale litigation. Mr. Singh did, however, tell the Debtors that the filing of the bankruptcy petition would stay the state court litigation. The Debtors were shocked when, only 9 days after the bankruptcy petition was filed, Spielman and Gale filed an emergency motion for relief from the automatic stay.

The Debtors were not informed by Mr. Singh that the automatic stay of the state court litigation could be lifted, and lifted quickly. They understandably panicked because they had just spent all of their money to retain Mr. Singh, but he was unwilling to defend the quickly-filed (and quickly set) lift-stay motion. They were referred to Robert F. Reynolds, an able bankruptcy attorney who does perform trial work, and his fee was $5,000.00 (which they could not then afford). The Debtors pawned the only thing they had of substantial value, a 3.15-carat diamond engagement ring which was originally purchased for $17,000.00. The ring was pawned on December 17, 2009 without court approval, and the Debtors received $10,000.00 in exchange for the ring.

The Debtors admit that they never had the ring appraised, but Mr. Charno testified that he believed the valuation of the ring was reasonable. He based his conclusion on his understanding of two facts: first, that the resale value of jewelry is much lower than its initial sale price; and second, that the person from whom he bought the jewelry was something of a shark who "got into trouble" for misrepresenting the value of other jewelry he sold. Mr. Charno further testified that, upon close examination of the ring, he could see flaws with the naked eye. He accordingly concluded that $10,000.00 was a fair price, especially considering that he was pawning the ring through a trusted family friend in New York City. The Debtors testified that $5,000.00 of the proceeds were used to pay Mr. Reynolds, $1,700.00 was used to keep their electricity on, $2,000.00 was used to pay

3

Mr. Singh (on top of his initial $5,000 bankruptcy retainer) for state court foreclosure defense, and the remaining proceeds were used to pay for essential living expenses.

The Debtors listed the value of the ring on their initial bankruptcy schedules filed in the main case on December 31, 2009. *See* [ECF No. 25]. When asked by the Chapter 7 Trustee whether they still had all of their jewelry, they were forthcoming and told the Trustee that they had pawned the ring. They also testified that they pawned the ring at their May 20, 2010 examination under Fed. R. Bankr. P. 2004. At trial, their testimony was credible and their demeanor was appropriately contrite. But the United States Trustee contends that the Debtors' discharge should be denied not only because the Debtors pawned the ring post-petition, but also because Mrs. Charno transferred her ownership in Charno Custom Rides post-petition – to Joint Debtor Mr. Charno.

Charno's Custom Rides ("CCR") was financial marginal at best. CCR repaired luxury vehicles and bid on government contracts. It was at one point hired by police departments to provide services for trailers used to collect evidence, and the Debtors had decided that it would be more beneficial if Mrs. Charno were listed as CCR's owner (because the business would be a Woman-Owned Entity which would qualify for more government contracts). They consequently changed CCR's records with the Florida Secretary of State to list Mrs. Charno as the owner.

In 2010, the Debtors decided to transfer the record ownership with the Florida Secretary of State back to Mr. Charno because Broward County no longer awarded contractual advantage based on whether a company was a Woman-Owned Entity. The Debtors argue that there was never any stock transfer nor any other document which formally changed the ownership of the company other than the Secretary of State's registration information. Mrs. Charno was not involved with CCR on a daily basis, as she primarily cared for the Debtors' children and worked on charitable projects.

4

The United States Trustee contends that the pawning of the engagement ring combined with the transfer of CCR between the Joint Debtors requires denial of discharge under 11 U.S.C. § 727(a)(2)(B). For the reasons discussed below, I disagree with the United States Trustee because I find that neither transfer was made with requisite intent to hinder, delay, or defraud.

### *Discussion*

One of the central purposes of bankruptcy "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[1] But this "fresh start" is only available to the "honest but unfortunate debtor."[2]

"Chapter 7 authorizes a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors[,]" but discharge can be denied in a variety of circumstances under 11 U.S.C. § 727. Here, the Plaintiff objects to the Debtors' discharge under § 727(a)(2):

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed:
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> > (B) property of the estate, after the date of the filing of the petition.

---

[1] *Grogan v. Garner*, 498 U.S. 279 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[2] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S. Ct. 1105 (2007).

For a court to deny discharge under § 727(a)(2), a plaintiff must prove that:

>  (1) a transfer occurred;
>
>  (2) if the transfer was made within one year before the filing, that it was property of the debtor or, if after the filing of the petition, that it was property of the estate; and
>
>  (3) at the time of the transfer the debtor possessed the requisite intent to hinder, delay or defraud a creditor.[3]

The post-petition "transfer" of CCR from Mrs. Charno to Mr. Charno is not a "transfer" within the meaning of § 727(a)(2), and the pawning of the engagement ring was not made with intent to hinder, delay, or defraud within the meaning of § 727(a)(2).

1.    The CCR Transfer from Mrs. Charno to Mr. Charno.

The Debtors admit that they changed the registered ownership of Charno's Custom Rides with the State of Florida in 2010 from Amanda Charno to Ross Charno. Though this was a clear post-petition registration change, the facts are murky regarding whether any stock or interest was ever actually transferred between the couple. Mr. Charno testified that he does not remember ever issuing shares of stock from the corporate book when the company was formed and testified that there are no documents evidencing the change in ownership other than the registration change with the Secretary of State. I need not address the factual holes in the Debtors' testimony, however, because it is clear this was not a transfer within the meaning of § 727(a)(2).

Section 101(54) defines a transfer as "the creation of a lien; the retention of title as a security interest; the foreclosure of a debtor's equity of redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with: (a) property, or (b) an

---

[3] *Bauman v. Post (In re Post)*, 347 B.R. 104, 109 (Bankr. M.D. Fla. 2009) (citing *First Florida Bank, N.A. v. Rowe (In re Rowe)*, 81 B.R. 653, 657 (Bankr. M.D. Fla 1987)).

interest in property."[4]

> Though the cases diverge on § 727(a)'s fine points, a common thread
> runs throughout: in order to constitute a "transfer" subject to the
> consequences of § 727(a)(2)(A), the prospective bankruptcy debtor's
> property must have been removed, hidden, parted with or otherwise
> diminished. Without satisfaction of this requisite element, a discharge
> cannot rightly be denied under the Code. *See* 3 William L. Norton,
> Jr., Norton's Bankruptcy Law and Practice 2d § 74:4, at 74-8 (2007)
> ("By its terms, § 727(a)(2) establishes that the fair dealing necessary
> to qualify for a discharge includes refraining from actions intended
> to injure creditors, including the transfer, concealment or destruction
> of property.").[5]

Because Ross and Amanda Charno are Joint Debtors, it does not matter who was registered as the

owner of CCR with the Secretary of State.  It does not even matter if they transferred stock between

themselves.  All of their assets, regardless of whose name the assets were in, became property of the

joint bankruptcy estate upon filing.  Even if the actions of the Debtors constituted a transfer of an

interest from Mrs. Charno to Mr. Charno, no interest ever left the bankruptcy estate.  This is not a

case where Debtors transferred an ownership interest in property from the filing spouse to the non-

filing spouse before the filing of the bankruptcy petition.  The "change of ownership" occurred after

the bankruptcy petition was filed, at a time when CCR was property of the bankruptcy estate and

not owned by either Debtor individually.  Where property never had occasion to leave the safety of

the bankruptcy estate, no transfer occurred for purposes of a § 727(a)(2) objection to discharge, and

it would likewise be impossible to conclude that the Debtors had intent to hinder, delay, or defraud

a creditor.  Because no property was ever "removed, hidden, parted with or otherwise diminished"

---

[4]  11 U.S.C. § 101(54).

[5]  *Worster v. Gauvreau (In re Gauvreau)*, 375 B.R. 14, 18-19 (Bankr. D. Me. 2007) (finding that no transfer
occurred where debtors quitclaimed their jointly owned property to husband less than a year before filing
bankruptcy).

from the estate, there was no "transfer." Accordingly, the Debtors' discharge will not be denied based on the "transfer" of CCR between the Joint Debtors after they filed their bankruptcy petition.

2.   The Diamond Engagement Ring

The Debtors admit that they sold a 3.15ct diamond engagement ring after they filed their bankruptcy petition. The engagement ring was property of the bankruptcy estate. It is clear that this was a "transfer" within the meaning of § 727(a)(2) and the issue is whether the Debtors transferred the ring with intent to hinder, delay, or defraud. The United States Trustee must prove actual intent to hinder, delay, or defraud (constructive intent is not enough).[6] "Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence or inferred from the debtor's course of conduct."[7] Courts have identified several circumstantial badges of fraud to show that a debtor had actual intent to hinder, delay, or defraud:

> (1) the lack or inadequacy of consideration for the property received;
>
> (2) the nature of the relationship between the transferor and the transferee;
>
> (3) whether the transferor retains possession, control, benefits, or use of the property in question;
>
> (4) whether the transfer resulted in insolvency;
>
> (5) the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and
>
> (6) the general chronology and timing of the transfer in question.

---

[6] *In re Smoot*, 265 B.R. 138, 142 (Bankr. E.D. Va. 1999).

[7] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008) (citation omitted).

After examining the evidence in light of these badges of fraud, I find that the United States Trustee has failed to prove actual intent to hinder, delay, or defraud. Mr. Charno's testimony regarding the $10,000 pawn price of the ring was credible, and I find that he reasonably believed $10,000 to be fair in the circumstances.[8] This was not a transfer to a family member for less than reasonably equivalent value with an intent to reclaim the ring later. There are no allegations that the transfer resulted in the Debtors' insolvency. The only argument with any traction is that the Debtors used the pawn proceeds to defend the emergency motion for relief from stay, "hindering" the state court litigation. But these Debtors were placed in an awful situation because their initial bankruptcy attorney, Mr. Singh (who commanded a $5,000 retainer), expressly excluded defense of the promptly filed lift-stay motion from the scope of his employment. Mr. Singh failed to adequately impress upon the Debtors that the state court plaintiffs could promptly appear in bankruptcy court and eviscerate the automatic stay protection that, in their reasonable view, Mr. Singh's $5,000 was supposed to provide. Mr. Singh knew that the Debtors' primary reason for filing bankruptcy was the Spielman/Gale litigation; he chose to take them on as clients for a significant fee and exclude responsibility for contested matters; and all this notwithstanding the reasonable prospect (if not likelihood) of a contested lift-stay hearing early in the case. Mr. Singh told the Debtors that filing bankruptcy would commence an automatic stay of the Spielman/Gale litigation and give the Debtors breathing space, but he did not adequately warn the Debtors that the automatic stay could be lifted very quickly, requiring the Debtors to "double up" on bankruptcy attorneys less than two weeks after the case was filed.

---

[8] Unlike the Debtor in *In re Jalajel*, who purchased 28 pieces of jewelry two years before he filed bankruptcy, sold various pieces after filing bankruptcy, including a Rolex watch he valued at $100.00 on his Schedules, but sold for $3,000. *See Pugsley v. Jalajel (In re Jalajel)*, No. 09-0114, 2010 Bankr. LEXIS 3537 (E.D. Va. Oct. 8, 2010).

As it turned out, the Spielman/Gale emergency lift-stay motion was filed nine days after the petition, and set for hearing only a few days after that on an emergency basis. The Debtors understandably panicked, pawned the diamond engagement ring to hire a bankruptcy attorney who would in fact protect them, and disclosed the transaction at every relevant stage of these proceedings. The have reached a settlement with the Chapter 7 Trustee to return the value of the ring to the bankruptcy estate, and I accordingly find that they did not possess requisite intent to hinder, delay, or defraud for purposes of § 727(a)(2).[9] The Debtors have been credible and honest. They never hid the fact that they sold the ring post-petition without court approval. By being forthcoming to this court, the Chapter 7 Trustee, and the United States Trustee, the Debtors have ensured that creditors of this estate are not defrauded (because the Chapter 7 Trustee has at all times been aware of the need to return the value of the engagement ring to the bankruptcy estate). This is a rare situation where the Debtors were placed in an untenable position and acted (albeit improperly) out of perceived necessity. The United States Trustee has failed to show that the Debtors are not entitled to discharge by the preponderance of evidence.[10] Denial of discharge is a harsh sanction[11] which should be construed liberally in favor of the Debtors (and strictly against the Plaintiff).[12] The Debtors here did not transfer the ring with intent to hinder, delay, or defraud, and their discharge will not be denied by virtue of this action.[13]

---

[9] *See generally Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 487-88 (Bankr. M.D. Fla. 1998).

[10] *See Grogan*, 498 U.S. 279 (1991).

[11] *Fokkena v. Smith (In re Smith)*, 373 B.R. 895, 900 (Bankr. N.D. Iowa 2007).

[12] *In re Cutignola,* 87 B.R. 702, 706 (Bankr. M.D. Fla. 1988).

[13] At a status conference conducted May 24, 2011 in this adversary proceeding and the main case, counsel for the Chapter 7 Trustee and counsel for the Debtors represented that the Trustee has an open-ended opportunity to object to discharge in the event that the Debtors do not comply with their agreed payment plan.

### *Conclusion*

I find that Ross and Amanda Charno are honest yet unfortunate Debtors who deserve a fresh start.  The "transfer" of the Joint Debtors' interest in CCR between themselves was not a "transfer" for purposes of § 727(a)(2) and, even if it were, I find that it was not made with intent to hinder, delay, or defraud.  The transfer of the diamond engagement ring was an improper transfer, but I find that it was not made with intent to hinder, delay, or defraud.  These Finding of Fact and Conclusions of Law are entered pursuant to Fed. R. Bankr. P. 7052, and a separate final judgment in favor of the Defendant Debtors will be entered pursuant to Fed. R. Bankr. P. 7058.

SO ORDERED.

# # #

Copies to:     *The Clerk of Court is directed to provide copies of this order to all interested parties registered to receive notice.*

-11-